UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DANIEL L. SMITH,

                        Plaintiff,

    -against-

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
-----------------------------------------------------------------x

MEMORANDUM & ORDER
14-CV-4823 (ENV)

VITALIANO, D.J.

      Plaintiff Daniel L. Smith seeks review, pursuant to 42 U.S.C § 405(g), of the final decision of the Commissioner of Social Security ("Commissioner"), dated February 26, 2013, finding that he was not "disabled" and, as a result, ineligible to receive Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"), as provided, respectively, under Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff argues that the administrative law judge ("ALJ") erred in failing to apply the appropriate legal standards and that the decision was not supported by substantial evidence. The Commissioner stands by her determination. For the reasons that follow, the Commissioner's motion is denied and Smith's cross-motion is granted to the extent that this case is remanded for further administrative proceedings.

1

## Background

On February 8, 2011, Smith, a military veteran, filed applications for DIB and SSI based on a compounding of illnesses and disorders: post-traumatic stress disorder ("PTSD"), osteoarthritis, anxiety, depression, fibromyalgia, anemia and high blood pressure. Record, Dkt. No. 8 ("R."), at 24, 248. The Social Security Administration ("SSA") denied the applications on April 28, 2011. R. at 24. Following this rejection by SSA, Smith properly requested review through an administrative hearing, which took place, on September 28, 2012, before ALJ Robert Gonzalez. R. at 23-24. Smith, who was and remains represented by counsel, appeared and testified. R. at 24. In complement to his testimony, he provided extensive medical records, reflecting that his life since the armed services had been dominated by visits to various doctors at Veterans Affairs ("VA") hospitals and struggles with a lengthening list of illnesses. These records included assessments and opinions regarding his condition by various treating sources.

Smith completed high school before enlisting in the U.S. Army in 1988. R. at 47, 299. He subsequently completed two years of college. R. at 47, 249. At the hearing, on direct examination, Smith stated that, during his three years of service, he was deployed to Iraq in Operation Desert Storm. R. at 53, 299. Unfortunately, Smith's time "in country" took both a psychological and physical toll on him. R. at 52-56. The horror of battle, including the loss of a close friend, caused him to experience PTSD, including traumatic flashbacks, which could occur as often as four times per week. R. at 53-55. In fact, he began to suffer a flashback during his

2

testimony, forcing the ALJ to pause the proceedings for five minutes. R. at 54-55. As to physical impairments, Smith testified that he suffers from a pain that radiates down the left side of his body from his neck to his hip. R. at 56. That this pain, he continued, persists despite the physical and neurological therapy he has received. R. at 56. Additionally, although he takes Gabapentin for nerve pain and Baclofen for muscle relaxation, these medications cause their own set of debilitating side effects, including syncope, dizziness and nausea. R. at 57.

With those unfortunate maladies as his legacy, Smith left the armed services to rejoin civilian life and search for work. In 1994, Smith, following in the footsteps of many veterans of his era, began working as a security guard. R. at 299. It was a position he would hold for 16 years. R. at 70-71. However, he testified that this work did not permit him to use a cane, which caused him to experience back spasms and difficulty standing for prolonged periods. R. at 73. As time went on, these troubles caused him to be frequently absent and tardy, R. at 58, which resulted in his termination in September 2010, R. at 47. Smith went on to testify that, in 2011, hoping to find a more suitable occupation, he attended a certified home health aide course. R. at 48. Smith completed the course and immediately began looking for part-time work in the home health field. R. at 49, 71. The recurrence of his PTSD, however, forced him to stop his job search. R. at 50, 71-72. As of the date of the hearing, Smith remained unemployed. R. 47-48.

During Smith's direct testimony, the ALJ posed a series of questions focusing on his functional capabilities. R. at 63-65. Smith testified, in sum, that he lives alone, cooks mostly

3

prepared foods, is able to do his own laundry, and that a neighbor who knows of his disabilities drives him to the grocery store and helps him with cleaning. R. at 63-65. The ALJ also interrogated him about his dismissal as a security guard, questioning whether it was, in fact, due to disability-caused absenteeism and lateness. R. at 58-59. Throughout, the ALJ repeatedly questioned Smith about his alcohol use, noting what the ALJ perceived to be slips and slurs during his testimony. R. at 60-63, 88. Then, most improperly, the ALJ asked Smith's lawyer to smell her client's breath, effectively making counsel an unsworn witness. R. at 75. She advised, contrarily, that Smith's breath did _not_ smell of alcohol. R. at 75.

Not long after, on February 26, 2013, the ALJ issued his decision affirming SSA's denial of Smith's benefits. R. at 35. The decision tracked the appropriate administrative regulations for determining whether a claimant meets the Act's definition of disability. Specifically, it first recited that plaintiff was not currently engaged in substantial gainful employment. R. at 26. Next, came the finding that plaintiff had the following severe impairments that significantly limited his ability to do basic work-related activities: major depressive disorder, PTSD, hypertension, a herniated lumbar disc, cervical spinal disc herniations, osteoarthritis of the left knee, status post left ankle fracture with mild degenerative changes, anemia and diverticulitis. R. at 26. The ALJ also determined plaintiff's other disorders – reflux disease, fibromyalgia, asthma and headaches – were not severe enough to impede his ability to work. R. at 26. At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that

4

met or medically equaled the severity of one of the statutorily provided impairments. R. at 26-29. This conclusion required the ALJ to then determine whether Smith possessed the residual functional capacity ("RFC")[1] to perform his past relevant work. Accordingly, at the final step, Smith was found able to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b), but that his ability to crouch and stoop and to "understand, remember and carry out simple unskilled and some complex semi-skilled work" enabled him to work in fields such as security and home healthcare. R. at 29, 34. Giving a clue to the ultimate analysis, the ALJ held that, having looked for work in the home healthcare field, Smith had somehow demonstrated his ability to perform such work. R. at 34.

Important for this review, in any event, the ALJ made clear that his determination largely rested on his view that the diagnoses provided by certain of Smith's treating physicians were beyond belief. For instance, he gave little weight to the diagnosis of Dr. Julia Golier, a psychiatrist. R. at 28-29. Dr. Golier had treated Smith since 2009. R. at 751. Highlighted in a Mental Capacity Assessment ("MCA"), dated April 4, 2011, Dr. Golier noted that Smith had marked limitations in several areas essential to holding steady work, including his abilities to maintain attention and concentration for extended periods, to perform activities within a fixed

---

[1] According to SSA regulations, "residual functional capacity" exists when an "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1); see also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

5

schedule, and to complete a normal workday or workweek without interruptions from psychologically based symptoms. R. at 748-49. Further, Dr. Golier noted that, without improvements in each of these deficits, Smith would be absent from a job an average of four or more times a month. R. at 749.

Significantly, nine months later, Dr. Golier noted no improvement in any of these areas. R. at 680-82. Quite the opposite. Smith's condition, as described in the second MCA, had worsened, with Smith exhibiting additional marked limitations in his abilities to travel in unfamiliar places or use public transit and to set realistic goals or make plans independently. R. at 682. Yet, the ALJ disregarded this analysis, concluding that Dr. Golier's "assessment regarding the claimant's marked mental limitations is . . . poorly supported by substantial evidence, namely her own treatment notes." R. at 28.

The ALJ also gave limited weight to the opinion of Dr. David Mahony, a psychologist, because Dr. Mahony had, the ALJ wrote, based his assessments of Smith's limitations on "[Smith's] own reports of [his] mental limitations." R. at 31-32. In a seemingly weird twist, the ALJ also discounted Dr. Mahony's opinion because it was at odds with the findings of Dr. Golier, whose views the ALJ had just criticized. R. at 32. What the ALJ meant, apparently, was that Dr. Mahony's diagnosis should be discounted because it clashed with the ALJ's own interpretation of the reports of Dr. Golier, which, the ALJ said, "show[ed] that the claimant was functioning at a higher level than alleged." R. at 32. Finally, the ALJ determined that plaintiff's

6

disability claim was undermined by his own testimony that he could, at times, complete "daily activities, which [were] not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. at 33.

The decision of the ALJ became the final order of the Commissioner on June 13, 2014 when the Appeals Council denied Smith's request for review. R. at 1-5. Smith filed this action on August 13, 2014 to challenge the Commissioner's adverse determination.

## Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify it, "with or without remanding . . . for a rehearing." See 42 U.S.C. § 405(g); see also Butts v. Barnhart, 388 F.3d 377, 384-85 (2d Cir. 2004). The law does fly a cautionary flag, though, since this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, the reviewing court may reverse the decision only if that decision is rooted in legal error or if the factual findings are not supported by substantial evidence. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)).

Courts are advised to "keep[ ] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (first alteration in original) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Consequently, if "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

A "disability" justifying SSI benefits exists if the claimant demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); Schaal, 134 F.3d at 501. The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The primary guidance governing the assessment of disability is the "treating physician rule." In making a disability determination, an ALJ must generally give "controlling weight" to the opinion of the claimant's treating physician or psychiatrist as to the nature and severity of his patient's physical and/or mental impairments if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Although the ultimate determination of disability is left to the ALJ hearing the proof, 20 C.F.R. § 404.1527(e)(2), it is equally clear that "a statement by a treating source that a claimant is disabled should not be disregarded," Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 96 (2d Cir. 2010). Thus, in analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 862 (2d Cir. 1990) ("[A] circumstantial critique by [a] non-physician[ ], however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion."). Rather, it is obligatory that an ALJ who does not give controlling weight to a treating source's professional opinion must plainly articulate good, record-based reasons for doing so. See Halloran, 362 F.3d at 32-33; Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993); Santiago v. Barnhart, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006).

Most important, if refusing to accord controlling weight to a treating physician's medical

9

opinion, in order to satisfy the plain-articulation standard, the ALJ "must explicitly [show his consideration of]," among other things, "(1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (second alteration in original) (quoting Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013)); see also Halloran, 362 F.3d at 32.

In reviewing this record, it is obvious that the ALJ did not adhere to these standards in applying the treating physician rule. Although, as is the nature of the VA system, Smith saw many healthcare professionals in his efforts to treat his illnesses and disorders, the record still certainly reflects that his longest-treating, most frequently seen and most substantive provider of services was Dr. Golier. See, e.g., R. at 320-24, 619-25, 627-36, 710-12. Yet, she is the doctor whose opinion the ALJ singled out to contradict. See R. at 28.

Notwithstanding Dr. Golier's lengthy experience with Smith and the thorough analysis of his history and treatment that were the bases for her diagnosis, the ALJ afforded her opinion little weight. R. at 28. His reason, in sum, was that her treatment notes did not support her assessments since they indicated that Smith was looking for work as a home healthcare aide in September 2011. Stunningly, without reference to an opinion by another healthcare professional calling Dr. Golier's opinion into question, the ALJ opined on his own that the treatment notes signified that Smith was, in fact, capable of working. R. at 28, 34. It hardly needs saying,

10

however, that Smith, whose SSI and DIB applications had recently been denied, may have believed he had no alternative but to look for work in spite of his hardships. Putting aside the illogic of inferring non-disability from a desire to work, in rejecting Dr. Golier's opinion, the ALJ failed to articulate record-supported findings that are prerequisite to disregarding a treating physician's opinion. See Greek, 802 F.3d at 375.

Simply stated, there is no meaningful discussion of the frequency, length, nature and extent of the treatment provided by Dr. Golier nor the special expertise incorporated in her opinion. Nor is there a substantive analysis of how Dr. Golier's opinion contrasted with other healthcare or vocational evidence developed in the record. Moreover, as noted earlier, after cursorily devaluing Dr. Golier's opinion, the ALJ relied on his own understanding of Dr. Golier's treatment notes to discount the opinion of another treating source--Dr. Mahony. R. at 30. Here too, the ALJ failed to properly analyze Dr. Mahony's view before rejecting it. Bluntly, the ALJ utterly failed to articulate the kind of reasons the regulations and case law require before deciding not to give the treating mental health professionals' opinions controlling weight. The error is fatal. See Valet v. Astrue, No. 10-CV-3282 (KAM), 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012) (concluding that remand was appropriate because the ALJ's reasoning in not affording controlling weight to the treating physician was "flawed and insufficient"); Jeffcoat v. Astrue, No. 09-CV-5276 (KAM), 2010 WL 3154344, at *13-15 (E.D.N.Y. Aug. 6, 2010) (remanding because the ALJ failed to comprehensively set forth reasons for assigning less than

controlling weight to treating physician's opinions).

Furthermore, even where the ALJ did rely on Dr. Golier's findings, he cherry-picked those that supported his personal view. For example, he cites for reference Dr. Golier's finding that Smith responded positively to anti-depressant medication and was able to concentrate on a mental status examination. R. at 28. But this minor point is clearly overshadowed by Dr. Golier's consistent finding that Smith suffered from major depression and insomnia. R. at 619-22, 627-33, 711-12. These findings went overlooked in favor of the ALJ's own yardstick, which "arbitrarily substitute[d] his own judgment for competent medical opinion." McBrayer, 712 F.2d at 799. Indeed, it is obvious that in reaching his determination, the ALJ relied on his own lay critique of the record evidence. See Wagner, 906 F.2d at 862.

Finally, it should not go unnoticed that Smith's psychological disabilities were on full display at the hearing. The ALJ had to pause the proceeding for five minutes to allow him to collect himself after testifying about his war-time service in the Army. R. at 54-55. Seeing Smith's condition at the hearing should have left little doubt of his compromised state, but it did not even register in the notice of determination. R. at 24-35. At any rate, it should have alerted the ALJ to develop the record further before rejecting the opinions of Drs. Golier and Mahony. See Halloran, 362 F.3d at 31; Jeffcoat, 2010 WL 3154344, at *8-9.

On another front, as previously noted, Smith testified that he lives alone, cooks mostly prepared foods, is able to do his own laundry, and that a neighbor who knows of his disabilities

12

drives him to the grocery store and helps him with cleaning. R. at 63-65. On this testimony of a struggle to meet daily needs, the ALJ, in large part, apparently rests his conclusion of non-disability, finding that Smith is "able to tend to his personal needs, cook, clean, shop and do the laundry." R. at 33. Yet, the conclusion turns a blind eye to Smith's testimony that his neighbor helps him clean the apartment and drive him to the grocery store because the neighbor knows of his disabilities. R. at 63-65. Further, Smith testified that he cooks mostly prepared meals so that he does not have to exert more effort than he is able. R. at 63. Moreover, in relying on this dubious evidence of ability, the ALJ's opinion runs afoul of the maxim that "people should not be penalized for enduring the pain of their disability in order to care for themselves." Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); see also Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act." (quoting Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988))). Even if the findings as to these sorts of abilities are to be credited, they do not command a finding of non-disability.

## Conclusion

In line with the foregoing, the Commissioner's motion for judgment on the pleadings is denied and Smith's cross-motion is granted to the extent that the final order of the Commissioner is reversed, the decision of the ALJ is vacated, and the matter is remanded to the Commissioner for further administrative proceedings consistent with this order.

13

The Clerk of Court is directed to enter judgment accordingly and to close this case for administrative purposes.

So Ordered.

Dated: Brooklyn, New York
      October 28, 2016

/s/ USDJ ERIC N. VITALIANO
ERIC N. VITALIANO
United States District Judge